## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **CHARLOTTE AMANDA BISHOP,** | ) | |
| Plaintiff | ) | |
| | ) | Civil Action No. 2:19cv00015 |
| v. | ) | |
| | ) | **REPORT AND** |
| **ANDREW SAUL,** | ) | **RECOMMENDATION** |
| **Commissioner of Social Security,** | ) | |
| Defendant | ) | By: Pamela Meade Sargent |
| | | United States Magistrate Judge |

### I. Background and Standard of Review

Plaintiff, Charlotte Amanda Bishop, ("Bishop"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It

consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Bishop protectively filed her application for DIB on May 13, 2015, alleging disability as of July 28, 2014, based on neck and lumbar pain; degenerative discs; spurs; arthritis; numbness in both arms; asthma; leaking vessels; coughing up blood; depression; and anxiety. (Record, ("R."), at 35, 217-18, 237.) The claim was denied initially and upon reconsideration. (R. at 141-43, 145-47, 150-52, 156-58, 161.) Bishop then requested a hearing before an administrative law judge, ("ALJ"). (R. at 162-63.) The ALJ held a hearing on December 18, 2017, at which Bishop was represented by counsel. (R. at 74-112.)

By decision dated May 15, 2018, the ALJ denied Bishop's claim. (R. at 35-44.) The ALJ found that Bishop met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2019. (R. at 37.) The ALJ found that Bishop had not engaged in substantial gainful activity since July 28, 2014, the alleged onset date.[1] (R. at 37.) The ALJ determined that Bishop had severe impairments, namely chronic obstructive pulmonary disease, ("COPD"), and spine disorders, but he found that Bishop did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 37-38.) The ALJ found that Bishop had the

---

[1]    Therefore, Bishop must show that she was disabled between July 28, 2014, the alleged onset date, and May 15, 2018, the date of the ALJ's decision, in order to be eligible for benefits.

residual functional capacity to perform light[2] work that required no more than frequent reaching overhead to the left and right and no more than occasional working around dust, odors, fumes and pulmonary irritants. (R. at 39.) The ALJ found that Bishop was unable to perform any of her past relevant work. (R. at 42.) Based on Bishop's age, education, work history and residual functional capacity, and the testimony of a vocational expert, the ALJ found there were other jobs existing in significant numbers in the national economy that Bishop could perform, including those of a cashier, a ticket taker and a gate guard. (R. at 42-43.) Thus, the ALJ concluded Bishop was not under a disability as defined by the Act and was not eligible for DIB benefits. (R. at 44.) *See* 20 C.F.R. § 404.1520(g) (2019).

After the ALJ issued his decision, Bishop pursued her administrative appeals, (R. at 216), but the Appeals Council denied her request for review. (R. at 1-6.) Bishop then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2019). This case is before the court on Bishop's motion for summary judgment filed August 23, 2019, and the Commissioner's motion for summary judgment filed October 7, 2019.

## II. Facts

Bishop was born in 1966, (R. at 217), which, on her alleged onset date, classified her as a "younger person" under 20 C.F.R. § 404.1563(c). She has an associate's degree in nursing and past work experience as a registered nurse. (R. at

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2019).

78, 80, 238.) Bishop testified that she had to frequently alternate between sitting and standing; she could sit, stand and walk up to 10 minutes without interruption; and that she had difficulty concentrating and staying focused. (R. at 85, 88.) She stated that she experienced some memory loss as a side effect of her medications. (R. at 95.) Bishop reported that she exercised regularly. (R. at 344, 354, 359, 496, 502.)

Asheley Wells, a vocational expert, also was present and testified at Bishop's hearing. (R. at 99-111.) Wells classified Bishop's past work as a registered nurse as skilled, medium work.[3] (R. at 100.) Wells testified that there were transferable skills from the registered nurse position that would allow a person to perform the jobs of a school nurse, which is a light, skilled job; a medical assistant, which is a light, skilled job; and a phlebotomist, which is a light, semi-skilled job. (R. at 100.) Wells testified that a hypothetical individual of Bishop's age, education and work history, who had the residual functional capacity to perform light work; who could frequently reach overhead; and who could occasionally work around dust, odors, fumes and pulmonary irritants, could not perform Bishop's past work. (R. at 101-02.) She stated that such an individual could make a vocational adjustment to a significant number of light jobs existing in the national economy, including the representative skilled and semi-skilled jobs of a school nurse, a medical assistant and a phlebotomist. (R. at 101-02.)

Wells then was asked to consider the same hypothetical individual, but who could stand and walk for four hours; occasionally reach overhead bilaterally, climb

---

[3] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2019).

ramps and stairs, stoop, kneel, crouch and crawl; and never climb ladders, ropes or scaffolds and balance. (R. at 102.) She stated that such an individual could not perform Bishop's past work, but that other jobs existed in significant numbers that such an individual could perform, including the job of a school nurse, as well as the light, unskilled jobs of a cashier and a ticket taker. (R. at 103.) In response to additional questioning, Wells further testified that, if the person had the additional restriction of performing all other kinds of reaching on an occasional basis, she could perform the light, unskilled job of a gate guard. (R. at 103-04.)

In rendering his decision, the ALJ reviewed medical records from David Deaver, Ph.D., a state agency psychologist; Dr. R. S. Kadian, M.D., a state agency physician; Richard J. Milan, Jr., Ph.D., a state agency psychologist; Dr. Carolina Bacani-Longa, M.D., a state agency physician; Wellmont Medical Associates; Pulmonary Associates of Kingsport; Holston Medical Group; Sapling Grove Family Physicians, ("Sapling Grove"); Dr. Patrick Riggins, M.D.; Kathy Birchfield, M.Ed., a licensed senior psychological examiner; Dr. Sung-Joon Cho, M.D.; and Holston Valley Medical Center. Bishop's attorney also submitted additional evidence from Blue Ridge Neuroscience Center, ("Blue Ridge"), and Colonial Heights Family Practice, ("Colonial Heights"), to the Appeals Council.[4]

The record shows that Bishop treated at Sapling Grove, which later became Holston Medical Group, where she was treated mainly by primary care physician

---

[4] Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 1-6), this court also must take these new findings into account when determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991).

Dr. Elizabeth Palmer, M.D.,[5] from October 2011 through April 2015, for various complaints such as back and neck pain; insomnia; asthma; headaches; depression; anxiety; hypertension; fatigue; shortness of breath; cervicalgia; right knee pain; and hemoptysis – the coughing up of blood. (R. at 349-68, 372-96, 399-407, 412-15, 418-22, 425-33.) During this time, physical examinations routinely revealed entirely normal objective findings, including normal respiratory rhythm and effort; clear bilateral breath sounds; regular heart rate and rhythm; a normal neck; a normal gait; normal movements of all extremities; normal muscle strength and tone; no clubbing, cyanosis or joint instability; intact insight and judgment; and a normal mood and affect. (R. at 355, 366, 375, 380, 386, 390-91, 394-95, 401-02, 406-07, 414-15, 420-21, 428, 432.) Bishop reported on numerous occasions that her anxiety and depression were stable. (R. at 353, 367, 372, 377, 418.)

The record shows that Bishop received pulmonary care from Wellmont Medical Associates from May 2013 through August 2016 for hemoptysis; bronchiectasis (a condition that makes it hard to clear mucus); recurrent pneumonia; and asthma. (R. at 290-302, 308, 313-19, 336-37, 448-49, 479-87, 506.) Bishop reported that she had smoked approximately half of a pack of cigarettes daily for 25 years, (R. at 290), but she temporarily quit smoking in October 2014. (R. at 313.)

In November 2014, Bishop complained of right knee pain and migraine headaches. (R. at 358-62.) She reported that she quit her job, but was working on finding another one. (R. at 358.) Examination was normal except for trace effusion noted in the right knee and some abnormal flexibility. (R. at 361.) In April 2015, Bishop complained of right knee pain and swelling. (R. at 349-51.) Examination

---

[5] Dr. Palmer also is associated with Colonial Heights.

showed mild puffiness on the medial and lateral aspect of the knee, as well as some tenderness on the medial aspect of the knee, and Bishop walked with a slight limp. (R. at 351.) On April 30, 2015, right knee x-rays revealed no significant degenerative changes. (R. at 348.)

As of April 2015, Bishop's hemoptysis had improved, (R. at 313), and by July 2015, it had resolved. (R. at 449.) On June 9, 2015, Bishop complained of increased anxiety and neck pain. (R. at 342-46.) Dr. Palmer diagnosed myalgia and myositis and depression. (R. at 342, 345.)

In June 2015, Bishop attended two appointments with Dr. Patrick Riggins, M.D., an orthopedic surgeon, for evaluation of her neck, right knee and right shoulder pain. (R. at 438-41.) After reviewing MRI studies of Bishop's neck and right knee, Dr. Riggins saw no findings that would require surgical intervention. (R. at 438.) Physical examination showed stiffness in Bishop's neck in all planes; she had limited range of motion of her right shoulder; she had full range of motion of her left shoulder; she had tenderness in her right knee; and she displayed no gross instability of the right knee. (R. at 438.) Dr. Riggins diagnosed mild cervical spine degenerative disc disease with disc bulging; right knee medial joint line osteoarthritis; and right shoulder rotator cuff tendinitis with impingement. (R. at 438.) He prescribed home exercises for her neck, shoulder and knee. (R. at 438.)

On July 15, 2015, Bishop's physical examination revealed normal findings, including normal heart rate, regular heart rhythm, normal breath sounds and normal pulmonary effort. (R. at 449.)

On October 30, 2015, Kathy Birchfield, M.Ed., a licensed senior psychological examiner, evaluated Bishop at the request of Disability Determination Services. (R. at 469-72.) Bishop reported that she underwent outpatient mental health treatment through Frontier Health.[6] (R. at 470.) Bishop identified her chief complaints as depression and "panic problems," but stated that she had not had any panic problems since she quit working. (R. at 470.) Bishop reported stressors, including family relationship issues and her mother's health. (R. at 470.) Bishop reported that her activities of daily living included drawing; watching television; keeping track of what needed to be bought at the store; shopping; cooking; and keeping track of family finances. (R. at 470.) Birchfield reported that Bishop's mood was positive and cooperative; her affect was congruent; she made fair eye contact; her judgment and insight were adequate; and her attention and concentration were adequate. (R. at 471.) Birchfield diagnosed unspecified depressive disorder. (R. at 471.)

Birchfield opined that Bishop was capable of understanding and remembering work-like procedures and instructions; sustaining concentration and persistence; maintaining a schedule and attendance; sustaining and retaining and working in coordination with others; maintaining socially appropriate behavior and basic standards of neatness; interacting appropriately with others; responding appropriately to changes in the work setting; and being aware of normal hazards and taking appropriate precautions. (R. at 471.)

On November 23, 2015, David Deaver, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding that Bishop was

---

[6] The record does not contain any records from Frontier Health, except for Birchfield's evaluation.

mildly restricted in her activities of daily living; experienced no difficulties maintaining social functioning or in maintaining concentration, persistence or pace; and had experienced no repeated episodes of extended-duration decompensation. (R. at 119-20.)

On November 24, 2015, Dr. R.S. Kadian, M.D., a state agency physician, completed a medical assessment, indicating that Bishop had the residual functional capacity to perform light work. (R. at 121-22.) No postural, manipulative, visual or communicative limitations were noted. (R. at 122.) Dr. Kadian found that Bishop should avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation. (R. at 122.)

On December 8, 2015, Bishop reported that her depression and neck pain had improved. (R. at 522.) Her physical examination was normal. (R. at 524.)

In March 2016, Bishop complained of severe cervicalgia with radicular symptoms. (R. at 517-21.) Bishop reported that she was doing well with her medications and that she was undergoing physical therapy with some improvement. (R. at 517.) Bishop's physical examination was normal except she had decreased right shoulder range of motion. (R. at 520.) On March 10, 2016, right shoulder x-rays revealed no acute fracture or subluxation; an unremarkable acromioclavicular, ("AC"), joint; and questionable cavitary mass overlying the right midlung. (R. at 508.)

On April 21, 2016, Dr. Sung-Joon Cho, M.D., examined Bishop at the request of Disability Determination Services. (R. at 473-77.) Bishop identified her chief complaint as neck pain. (R. at 473.) Bishop reported that she was independent with

activities of daily living, lived with her mother and performed light chores, such as folding clothes and sweeping for a few minutes, but she needed help with mopping and heavy lifting. (R. at 474.) She smoked 10 to 15 cigarettes daily. (R. at 474.) On examination, Bishop's lungs were symmetric and clear to auscultation with normal excursions and without rales or rhonchi; she walked with an unremarkable gait, although she had a "little bit of a limp" when walking on her tiptoes; she had negative straight leg raising bilaterally; she had no focal myalgic tenderness; she had intact sensation, intact reflexes, 5/5 left hand grip strength and 4+/5 right hand grip strength; she had unremarkable cervical range of motion; and she had slightly reduced right shoulder abduction. (R. at 475-76.) Dr. Cho reported that Bishop gave questionable effort on the motor function testing portion of the examination. (R. at 475.) Dr. Cho diagnosed chronic cervical neck pain, probably due to chronic degenerative joint disease; osteoarthritis of the right knee; and possible rotator cuff injury of the right shoulder. (R. at 476.)

Dr. Cho opined that Bishop could stand and/or walk for four to six hours in an eight-hour workday with rest breaks; she could sit up to six hours in an eight-hour workday with rest breaks; she could lift and carry items weighing 25 pounds occasionally and 10 pounds frequently; she could not climb or balance; she could occasionally stoop, kneel, crouch and crawl; and she could occasionally reach bilaterally. (R. at 476.) Dr. Cho reported that Bishop had no handling, feeling or fingering limitations, she had no workplace environmental limitations, and she did not need an assistive device. (R. at 476-77.)

On April 22, 2016, Richard J. Milan, Jr., Ph.D., a state agency psychologist, completed a PRTF, finding that Bishop was mildly restricted in her activities of daily living; experienced no difficulties maintaining social functioning or in maintaining

concentration, persistence or pace; and had experienced no repeated episodes of extended-duration decompensation. (R. at 133-34.)

On April 22, 2016, Dr. Carolina Bacani-Longa, M.D., a state agency physician, completed a medical assessment, indicating that Bishop had the residual functional capacity to perform light work, but was limited to frequent bilateral reaching. (R. at 135-37.) No postural, visual or communicative limitations were noted. (R. at 136.) Dr. Bacani-Longa found that Bishop should avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation. (R. at 137.)

In April 2015 and August 2016, Bishop returned to Wellmont Medical Associates for pulmonary treatment after diagnostic studies revealed that a cavitary lung lesion, which dated back to 2013, had slowly enlarged. (R. at 336, 479, 483, 506-08.) Bishop's physical examinations revealed normal findings, including a normal heart rate; regular heart rhythm; normal heart sounds; intact distal pulses; no gallop or friction rub; normal pulmonary effort; normal breath sounds; and no respiratory distress, wheezes, rales or tenderness. (R. at 481, 485.) As of August 2016, Bishop was diagnosed with a cavitary pulmonary lesion of uncertain etiology; bronchiectasis with intermittent hemoptysis; and mild, intermittent asthma. (R. at 486.) Bishop was advised to return in six months; however, it appears that Bishop did not return before the ALJ issued his decision. (R. at 486.)

On March 7, 2017, Bishop reported that she was doing well. (R. at 501.) She requested an order for physical therapy to address her pelvic floor dysfunction, and she attended this therapy in March and April 2017. (R. at 501, 528-37.) Bishop's physical examination was normal. (R. at 503-04.) Dr. Palmer reported that Bishop "continues to be the primary caregiver to her mother who has dementia." (R. at 501.)

11

In July 2017, Bishop asked to restart medication for her depression. (R. at 495.) Bishop's physical examination was normal. (R. at 498.)

Bishop attended five routine primary care visits with Dr. Palmer between January 2018 and December 2018 for continued medication management of her chronic medical conditions. (R. at 14-26, 49-66.) Bishop continued to exhibit entirely normal examination findings during all visits, except in September 2018, when she had a limping gait, sciatic notch tenderness and positive straight leg raise testing due to an exacerbation of her chronic back pain. (R. at 17, 52, 57, 62, 70-71.) In January and July 2018, Bishop reported that medication helped her pain and that her symptoms of anxiety had improved. (R. at 49, 59.) An August 2018 lumbar spine MRI revealed severe spinal stenosis at the L4-L5 level from a combination of congenitally narrow spinal canal, discogenic disease and ligamentous hypertrophy. (R. at 13, 65-66.)

In October 2018, Bishop saw Dr. Jon Taveau, D.O., a neurosurgeon, for her complaints of back and leg pain. (R. at 10-13.) On examination, Bishop had a limping gait, but generally intact motor strength, sensation and reflexes, except for absent right knee reflex, and she could stand without difficulty. (R. at 12-13.) Dr. Taveau discussed surgical intervention, but opined it might not improve her pelvic numbness, which was not a typical symptom of spinal stenosis. (R. at 13.) Bishop reported that she would proceed with surgery once she had insurance coverage. (R. at 13.)

In December 2018, Dr. Palmer noted that Bishop used a cane for ambulation. (R. at 14.) Bishop's examination was normal. (R. at 17.) Dr. Palmer diagnosed cervical disc disorder with radiculopathy; multilevel degenerative disc disease;

spinal stenosis of the lumbar spine; and urinary tract infection. (R. at 17.)

### III.  Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2019). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2019).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its

judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Bishop argues that the ALJ's decision is not based upon substantial evidence.[7] (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 8-10.) In particular, Bishop argues that the ALJ erred by failing to properly meet his step five burden of identifying other work that she could perform. (Plaintiff's Brief at 10-11.) Bishop contends that the ALJ erred in finding that her past work skills would transfer to unskilled work. (Plaintiff's Brief at 10-11.) Bishop also argues that the ALJ failed to properly analyze all the relevant evidence and sufficiently explain his rationale for accepting some limitations given by Dr. Cho, while rejecting others. (Plaintiff's Brief at 11-13.) Bishop further argues that the ALJ failed to properly evaluate her allegations of pain. (Plaintiff's Brief at 13-15.) Finally, Bishop contends that remand is warranted based on new evidence submitted to the Appeals Council. (Plaintiff's Brief at 15.)

Bishop contends that the ALJ's step-five finding is erroneous because the ALJ determined she had transferable skills, but ultimately identified only examples of unskilled, rather than skilled or semi-skilled jobs, that she could perform at step five. (Plaintiff's Brief at 10-11; R. at 42-44.) I do not agree. The record indisputably

---

[7] Bishop's only dispute is with respect to the ALJ's assessment of her physical limitations. Therefore, the court will address the facts relevant to Bishop's physical health.

proves that there was a significant number of jobs that Bishop could perform whether or not she had transferable skills. (R. at 100-04.) The fact that the ALJ failed to cite the skilled and semi-skilled jobs identified by the vocational expert in the decision amounts to nothing more than harmless error.

The Fourth Circuit routinely applies the doctrine of harmless error in evaluating whether to remand a disability appeal based on an ALJ error. *See Patterson v. Comm'r of Soc. Sec.,* 846 F.3d 656, 658 (4th Cir. 2017) (citing *Shinseki v. Sanders*, 556 U.S. 396, 407 (2009)). Harmless error review is grounded in sound considerations of administrative policy to avoid "idle and useless formalit[ies]" by converting judicial review of agency action "into a ping-pong game." *NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 766 n.6 (1969). Unless there is "reason to believe that the remand might lead to a different result," neither the law, nor common sense, requires a remand in "quest of a perfect opinion." *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) (citations omitted). Instead, when an ALJ's decision "'is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time.'" *Bishop v. Comm'r of Soc. Sec.,* 583 F. App'x 65, 67 (4th Cir. 2014) (quoting *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010)).

By relying on the vocational expert's testimony, the ALJ determined that Bishop had acquired work skills from past relevant work. (R. at 43.) The ALJ then found that, considering Bishop's age, education, work experience and residual functional capacity, she had acquired work skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy. (R. at 43.) To support the step five determination, the ALJ

inadvertently cited the light, unskilled jobs of cashier, ticket taker and gate guard as examples of occupations that Bishop could perform. (R. at 43.) However, the ALJ should have cited the skilled or semi-skilled jobs identified by the vocational expert in the decision because "[t]ransferability means applying work skills which a person has demonstrated in vocationally relevant past jobs to meet the requirements of other skilled or semiskilled jobs." Social Security Ruling, ("S.S.R."), 82-41(1)(b), WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings, 1982 WL 31389, at *2 (West 2013 Supp.); 20 C.F.R. § 404.1568(d)(1) (2019).

The vocational expert testified there were transferable skills from Bishop's past relevant work as a registered nurse that would allow a person to perform the jobs of a school nurse, classified as a light, skilled job; a medical assistant, classified as a light, skilled job; and a phlebotomist, classified as a light, semi-skilled job. (R. at 100.) In a hypothetical question that mirrored the residual functional capacity finding, the ALJ asked the vocational expert to assume a hypothetical person of Bishop's age, education and work experience, who had the residual functional capacity to perform light work that required no more than frequent reaching overhead bilaterally and that required no more than occasional exposure to dust, odors, fumes and pulmonary irritants. (R. at 101.) The vocational expert testified that such a person could make a vocational adjustment to a significant number of light jobs existing in the national economy, including the representative skilled and semi-skilled jobs of a school nurse, a medical assistant and a phlebotomist. (R. at 101-02.)

Furthermore, regardless of transferable skills, the vocational expert testified that an individual of Bishop's age, education and work experience, who had the residual functional capacity to perform an even more limited range of light work than found by the ALJ, could perform the unskilled jobs of a cashier, a ticket taker

and a gate guard. (R. at 103-04.) It is nonsensical to argue that Bishop's claim should be remanded because the ALJ found that she possessed transferable skills that were not necessary to perform these unskilled jobs. Thus, I find that Bishop's argument is without merit.

Bishop also argues that the ALJ failed to properly analyze all the relevant evidence and sufficiently explain his rationale for accepting only some limitations given by Dr. Cho, while rejecting others. (Plaintiff's Brief at 11-13.) The ALJ assigns weight to medical opinion evidence by considering several factors, such as the length and nature of the treatment relationship, whether the opinion is supported by medical signs and laboratory findings and whether the opinion is consistent with the record as a whole. *See* 20 C.F.R. § 404.1527(c) (2019).

The ALJ found that Bishop had the residual functional capacity to perform light work that required no more than frequent reaching overhead, bilaterally, and occasionally working around dust, odors, fumes and pulmonary irritants. (R. at 39.) In making this residual functional capacity finding, the ALJ stated that he was giving "some weight" to Dr. Cho's opinion limiting Bishop to a limited range of light work because it was consistent with the medical evidence of record. (R. at 42, 476-77.) While Bishop argues that the ALJ erred because he did not specifically articulate why he did not adopt all the limitations identified by Dr. Cho, the ALJ is not compelled to adopt Dr. Cho's opinion verbatim simply because he assigned some weight to his opinion. *See Bacnik v. Colvin,* 2014 WL 3547387, at *4 n.7 (M.D. N.C. July 17, 2014) (recognizing that an ALJ is not required to adopt every assessment in a report "even when according the report great weight overall") (citations omitted); *Wilkinson v. Comm'r of Soc. Sec.,* 558 F. App'x 254, 256 (3d Cir. 2014) ("no rule or regulation compels an ALJ to incorporate into an RFC every finding made by a

medical source simply because the ALJ gives the source's opinion as a whole 'significant' weight"); *Lambert-Newsome v. Astrue*, 2012 WL 2922717, at*6 (S.D. Ill. July 17, 2012) (noting the fact that ALJ gave great weight to an opinion "does not mean he was required to adopt it wholesale.").

The ALJ explained that the residual functional capacity finding was based on (1) Bishop's routine and conservative longitudinal treatment history, which included mostly primary care treatment and medication management; (2) her generally unremarkable physical examination findings, which routinely revealed a normal gait, normal motor strength, intact sensation and reflexes and normal pulmonary findings, (R. at 355, 366, 375, 380, 386, 390-91, 394-95, 401-02, 406-07, 414-15, 420-21, 428, 432); (3) her daily activities, which included being the primary caretaker of her mother, who had dementia, (R. at 501); and (4) the opinions of the two state agency medical consultants who opined Bishop could perform light work with no concentrated exposure to pulmonary irritants and frequent bilateral overhead reaching. (R. at 121-22, 135-37.)

The ALJ stated that he was giving the opinions of the state agency physicians "great weight" because their opinions were consistent with the record as a whole. (R. at 42.) Both Dr. Kadian and Dr. Bacani-Longa opined that Bishop could do a limited range of light work. (R. at 121-22, 135-37.) Under the regulations, the ALJ was entitled to rely on the state agency physicians' assessments. *See* 20 C.F.R. § 404.1513a(3)(b)(1) (2019) ("State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation."); *Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir. 1986) (Fourth Circuit cases "clearly contemplate the possibility that [treating physician] opinions may be rejected in particular cases in deference to conflicting opinions of non-treating physicians.");

S.S.R. 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources.").

Next, Bishop argues that the ALJ failed to properly evaluate her allegations of pain. (Plaintiff's Brief at 13-15.) The Fourth Circuit has adopted a two-step process for determining whether a claimant is disabled by pain. First, there must be objective medical evidence of the existence of a medical impairment which could reasonably be expected to produce the actual amount and degree of pain alleged by the claimant. *See Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Second, the intensity and persistence of the claimant's pain must be evaluated, as well as the extent to which the pain affects the claimant's ability to work. *See Craig*, 76 F.3d at 595. Once the first step is met, the ALJ cannot dismiss the claimant's subjective complaints simply because objective evidence of the pain itself is lacking. *See Craig*, 76 F.3d at 595. This does not mean, however, that the ALJ may not use objective medical evidence in evaluating the intensity and persistence of pain. In *Craig*, the court stated:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers….

76 F.3d at 595. As in the case of other factual questions, credibility determinations as to a claimant's testimony regarding her pain are for the ALJ to make. *See Shively*

*v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984). Furthermore, an ALJ's assessment of a claimant's credibility regarding the severity of pain is entitled to great weight when it is supported by the record. *See Shively*, 739 F.2d at 989-90.

In his opinion, the ALJ summarized and discussed Bishop's longitudinal treatment history, which revealed only routine and conservative treatment for her chronic medical conditions and her generally unremarkable physical examination findings, which routinely revealed a normal gait, normal motor strength, intact sensation and reflexes and normal pulmonary findings, (R. at 39-42, 355, 366, 375, 380, 386, 390-91, 394-95, 401-02, 406-07, 414-15, 420-21, 428, 432.) In November 2014, Bishop reported that she had quit her job, but was in the process of looking for another one. (R. at 358.) An April 2015 x-ray of Bishop's right knee showed no significant degenerative changes. (R. at 348.) In December 2015, Bishop reported that her pain had improved. (R. at 522.) X-rays performed in March 2016 of Bishop's right shoulder were normal, apart from a questionable cavitary mass overlying her right midlung. (R. at 508.) The ALJ further noted that consultative examiner Dr. Cho, as well as state agency medical consultants, Drs. Kadian and Bacani-Longa, all opined that Bishop could perform a limited range of light work despite her medical conditions. (R. at 41-42, 121-22, 135-37, 476-77.)[8] The fact that Bishop's testimony was not fully supported by the objective medical record was a legally valid reason under the regulations for the ALJ to assign only partial weight to her statements. *See* 20 C.F.R. § 404.1529(c)(2) (2019) ("Objective medical evidence… is a useful indicator to assist us in making reasonable conclusions about the intensity and

---

[8] No treating, examining or reviewing medical source suggested that Bishop had greater, let alone work-preclusive, limitations. *See Lane v. Comm'r of Soc. Sec.,* 100 F. App'x 90, 95-96 (3d Cir. 2004) (a lack of supporting medical opinion evidence from treating sources can be strong evidence that the claimant is not disabled); *Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983) (holding that the Commissioner is entitled to rely not only on what the record says, but also on what it does not say).

persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work").

In addition, the ALJ readily acknowledged that Bishop's pain prevented her from performing the medium work she had done in the past. (R. at 42.) *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986) (holding that an ALJ's finding that a claimant can do work only at an exertional level lower than in the past constitutes an implicit acceptance of her complaints and accords them appropriate weight). However, the ALJ was not required to find that Bishop was pain-free or experiencing no discomfort to find her not disabled. *See Hays*, 907 F.2d at 1458. Thus, I find that the ALJ's pain analysis and credibility determination are supported by substantial evidence.

Finally, Bishop argues the evidence submitted to the Appeals Council was "new" and "material" and warrants a remand. (Plaintiff's Brief at 15.) I am not persuaded by this argument. The Appeals Council must consider evidence submitted to it when it is deciding whether to grant review, "'if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision.'" *Wilkins*, 953 F.2d at 96 (quoting *Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir. 1990)). Evidence is "new" if it is "not duplicative or cumulative." *Wilkins*, 953 F.2d at 96 (citation omitted). Evidence is "material" if there is a "reasonable possibility that the new evidence would have changed the outcome." *Wilkins*, 953 F.2d at 96 (citing *Borders v. Heckler*, 777 F.2d 954, 956 (4th Cir. 1985)). In addition to showing the evidence is both new and material, the claimant seeking a remand must show good cause for her failure to submit the evidence when the claim was before the Commissioner. *See Owens v. Astrue*, 2010 WL 3743647, at *4 (W.D. Va. Sept. 22, 2010) (citing *Borders*, 777 F.2d at 955).

The Appeals Council rejected treatment notes from Colonial Heights, dated January 12, 2018, and April 6, 2018, because they did not show a reasonable probability that they would change the outcome of the ALJ's decision.[9] (R. at 2.) The Appeals Council also rejected treatment notes from Colonial Heights, dated July 12, 2018, to September 24, 2018, and treatment notes from Blue Ridge, dated October 24, 2018, because they did not relate to the period at issue, and, therefore, would not affect the ALJ's decision. (R. at 2.) The Appeals Council instructed Bishop if she wished it to consider whether she was disabled after May 15, 2018, she could file a new claim. (R. at 2.)

Any evidence submitted to the Appeals Council that it considers becomes part of the record that the court reviews to determine whether the Commissioner's decision is supported by substantial evidence. *See Wilkins*, 953 F.2d at 96. The court conducts this review under sentence four of 42 U.S.C. § 405(g) and may enter judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is not warranted where substantial evidence in the record supports the ALJ's decision despite the additional evidence. *See Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

---

[9] The Appeals Council also noted that it did not "exhibit this evidence." (R. at 2.) Any evidence that was not submitted to the Appeals Council, or that the Appeals Council chose not to incorporate into the record, is reviewed under sentence six of 42 U.S.C. § 405(g), which is narrower than sentence four. Sentence six allows a court to remand for the consideration of additional evidence if it is new and material, and good cause exists for its late submission, and the claimant must "present to the remanding court at least a general showing of the nature of the new evidence." *Owens*, 2010 WL 3743647, at *4 (citing *Borders*, 777 F.2d at 955). A court's authority under sentence six is limited to remanding the case for "additional evidence to be taken," *Wooding v. Comm'r of Soc. Sec.*, 2010 WL 4261268, at *2 (W.D. Va. Oct. 29, 2010), and it may not "rul[e] as to the correctness of the administrative determination." *Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citation omitted).

The Appeals Council determined there was no reasonable probability that the primary care records, dated from January 2018 and April 2018, would change the outcome of the decision. (R. at 2.) Based on my review of these treatment records, which showed Bishop received ongoing medication management for her chronic conditions and exhibited entirely normal examination findings, were merely cumulative of the records the ALJ already had considered. (R. at 1-2, 49-58.) Furthermore, Bishop reported that medication helped her pain. (R. at 49, 59.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

I also find that the Appeals Council properly decided that the treatment notes from Colonial Heights, dated July 12, 2018, to September 24, 2018, and treatment notes from Blue Ridge, dated October 24, 2018, did not relate to the period at issue. (R. at 2, 10-13, 20-26, 59-73.) Although an August 2018 MRI of Bishop's lumbar spine showed severe spinal stenosis at the L4-L5 level, it was noted in October 2018, that despite a limping gait, Bishop exhibited generally intact motor strength, sensation and reflexes, except for absent right knee reflex, and could stand without difficulty. (R. at 12-13.) In addition, in December 2018, while Bishop used a cane for ambulation, Dr. Palmer noted that her physical examination was normal. (R. at 17.) Contrary to Bishop's assertion, neither her subjective statements to her physicians nor her MRI results, standing alone, automatically translated into objective work-related functional restrictions. *See Craig*, 76 F.3d at 590 (a physician's recording of a claimant's subjective complaints does not transform the complaints into "clinical evidence"); *McCoy v. Astrue*, 2012 WL 1015785, at *22 (D. S.C. Feb. 10, 2012), adopted by 2012 WL 1015773 (D. S.C. Mar. 23, 2012) ("Plaintiff continues to confuse objective findings of her diagnoses with objective findings supporting her alleged functional limitations. The MRI is evidence of

23

Plaintiff's condition, not her functional limitations."). Thus, even when the Appeals Council evidence is considered, substantial evidence supports the ALJ's decision. *See Smith*, 99 F.3d at 638. Accordingly, remand for further consideration of the Appeals Council evidence is unwarranted.

Based on this, I find that substantial evidence exists to support the ALJ's finding that Bishop had the residual functional capacity to perform a limited range of light work.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  Substantial evidence exists in the record to support the ALJ's weighing of the medical evidence;

2.  Substantial evidence exists in the record to support the ALJ's finding as to Bishop's residual functional capacity;

3.  Substantial evidence exists in the record to support the ALJ's finding that other jobs existed that Bishop could perform; and

4.  Substantial evidence exists in the record to support the Commissioner's finding that Bishop was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Bishop's motion for summary judgment, deny the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    May 19, 2020.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE